# Exhibit "15"

# Deposition of Tammy Sprague
# (Relevant Portions)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEW MEXICO

In Re:

FRED DALE VAN WINKLE,



Debtor,  No. 13-1174 t7

TAMMY SPRAGUE, PERSONAL REPRESENTATIVE
OF THE ESTATE OF FRED DALE VAN WINKLE,

Plaintiff,

-vs-  Adv. No. 15-010471

JOHN WILLIAMS AND ELLEN B.
WILLIAMS, husband and wife,
and BELLEVIEW VALLEY LAND CO., INC.,

Defendants.

DEPOSITION OF TAMMY SPRAGUE

April 10, 2017
9:05 a.m. to 11:24 a.m.
443 Mechem Drive
Ruidoso, New Mexico

PURSUANT TO THE BANKRUPTCY RULES OF CIVIL

PROCEDURE, this deposition was:

TAKEN BY: W.T. MARTIN, JR., ESQ.
ATTORNEY FOR DEFENDANTS

REPORTED BY: JAN WIMBERLY, CCR No. 13
Dama's Reporting Service
P.O. Box 2022
Alamogordo, New Mexico 88311-2022

Page 9 (Pages 33-36)

Sprague v Williams, et al.
Adv No. 15-010471

Tammy Sprague
April 10, 2017

Page 33

1 Representative.
2  Q. Now, does that particular document contain
3 information that you deposited this $147,000 check
4 into that account?
5  A. Yes, it does.
6  Q. In your answers to the interrogatories in
7 relation to this $147,000, you indicated that this
8 was a loan to you; is that correct?
9  A. Correct.
10  Q. Who loaned you the money?
11      MR. ARVIZU: Objection. I'm going to
12 instruct my client not to answer the question.
13      MR. MARTIN: What is your reason?
14      MR. ARVIZU: This is under review by
15 Judge Thuma, there's a motion to compel that's been
16 filed and he has not ruled on the motion to compel.
17      MR. MARTIN: So you are refusing to answer
18 that --
19      MR. ARVIZU: Yes.
20      MR. MARTIN: -- today.
21      MR. ARVIZU: Yes.
22      MR. MARTIN: On the basis that Judge Thuma
23 has not ruled on the motion to compel?
24      MR. ARVIZU: Correct.
25      MR. MARTIN: Let me ask you this, so we

Page 34

1 can get it on the record --
2      MR. ARVIZU: Okay.
3      MR. MARTIN: -- Trey. What is -- other
4 than the fact that it is the subject of a motion to
5 compel, what is your basis for objecting to the
6 disclosure of who loaned the money?
7      MR. ARVIZU: Client's request.
8      MR. MARTIN: Let me put on the record that
9 that is not a valid reason for refusal to answer the
10 question or respond. The question directly relates
11 to issues in this case and if it doesn't directly
12 relate to this issues in this case, it certainly
13 leads to evidence that is relevant.
14  Q. (By Mr. Martin) Let me ask you this: You
15 have direct -- you have said you do not want to have
16 the name of the person that loaned you this money to
17 be disclosed --
18  A. Correct.
19  Q. -- is that correct?
20  A. Correct.
21  Q. Why do you not want to disclose who loaned
22 you the money?
23  A. They asked not to be disclosed.
24  Q. Have you signed a promissory note to them?
25  A. Yes, I have.

Page 35

1  Q. Is this more than one person?
2  A. I don't know.
3  Q. You don't know?
4  A. I don't know. It was a single person that
5 gave me the loan.
6  Q. And you have signed a promissory note?
7  A. I have signed a personal agreement in the
8 form of informal promissory note.
9  Q. So it's not a promissory note, it's just
10 some document that is an informal agreement?
11  A. It has not been filed anywhere that I'm
12 aware of.
13  Q. What are your terms of repayment?
14  A. Upon the settlement of the redemption and
15 the sale of the property.
16  Q. So as I understand your answer, your terms
17 of repayment are dependent upon what happens with
18 the redemption?
19  A. Correct.
20  Q. What is your obligation to repay, if you
21 are not successful in the redemption?
22  A. Then my brother, my sister and I will
23 divide the debt in three ways and make personal
24 payments.
25  Q. Are you making any payments on this debt

Page 36

1 now?
2  A. Not at this time.
3  Q. Is the lender a person or is it some kind
4 of entity of some nature?
5  A. I would assume that it came from a holding
6 company.
7  Q. You would assume that it came from a
8 holding company?
9  A. It came from a holding company.
10  Q. What type of holding company?
11  A. A personal holding company.
12  Q. What kind of business is this holding
13 company in?
14  A. I would assume that they are going to be
15 holding profits that they made from personal
16 business.
17  Q. To your knowledge, what type of business
18 does this holding company conduct or engage in at
19 the present time?
20  A. I don't know.
21  Q. Do you have an ownership interest in this
22 holding company?
23  A. No, I do not.
24  Q. Does your husband have an ownership
25 interest in this holding company?

Page 10 (Pages 37-40)

Sprague v Williams, et al.
Adv No. 15-010471

Tammy Sprague
April 10, 2017

Page 37

1   A.  No, we do not.
2   Q.  Do any of your other family members have
3   an ownership interest in this holding company?
4   A.  No.
5   Q.  How did you find this holding company?
6   A.  I didn't find a holding company.
7   Q.  How did you become aware of this holding
8   company?
9   A.  I borrowed money from the individual that
10  owns the holding company.
11  Q.  How did you become aware of the
12  individual?
13      MR. ARVIZU: Hey, Tom.
14      MR. MARTIN: Yes.
15      MR. ARVIZU: Let's stop this right now.
16  Let's not go down this road, let's just hold off on
17  this until Judge Thuma takes the motion to compel --
18      MR. MARTIN: I haven't asked for the
19  identity.
20      MR. ARVIZU: I understand, but you're
21  playing 20 questions here.
22      MR. MARTIN: Well, I have every right to.
23      MR. ARVIZU: Well, I'm just saying let's
24  hold off on this line of questioning.
25      MR. MARTIN: I'm not going to stop.

Page 38

1       MR. ARVIZU: Well, I'm going to instruct
2   you not to answer any further questions on this.
3       MR. MARTIN: And I'm going to enter an
4   objection to the instruction to stop responding to
5   perfectly legitimate discovery questions. Give me
6   just a moment, please.
7   Q.  (By Mr. Martin) You deposited the $147,000
8   into the estate account to make it an asset of the
9   estate, correct?
10  A.  I deposited it into there to disburse it
11  out of there.
12  Q.  For?
13  A.  For business.
14  Q.  Of the estate?
15  A.  For business of the estate, correct.
16  Q.  What did you pledge to secure this debt?
17  A.  Nothing. My name.
18  Q.  In 2015, you -- and when I say "you," I'm
19  talking in terms of the estate or you as personal
20  representative -- you started the process of
21  attempting to redeem the property in Otero County?
22  A.  Correct.
23  Q.  And did you deposit an amount in the court
24  registry which was $73,200.94?
25  A.  I believe that's the right amount.

Page 39

1   Q.  Again, this is public record, but let me
2   mark that as Exhibit 3. This is a conformed copy of
3   a -- or filed-stamped copy of an order. Do you
4   recognize that document?
5       (Exhibit No. 3 marked.)
6   A.  Yes, I do.
7   Q.  Okay. And does that document reflect the
8   amount that was deposited into the court registry?
9   A.  I believe it does.
10  Q.  Okay. Where did the $73,200.94 come from?
11  A.  Out of that $147,000.
12  Q.  Did you write the check?
13  A.  Yes, I did.
14  Q.  And did you write the check on or about
15  April 20, 2015?
16  A.  This is dated April 21st, and so I'm
17  assuming that I wrote it that day.
18  Q.  Okay. And do you have the canceled check?
19  A.  It would be a matter of bank record, yes.
20  Q.  Do you have the bank statement for April
21  of 2015 on the estate?
22  A.  Yes.
23  Q.  And would you have a copy of the canceled
24  check?
25  A.  It would be an electronic copy.

Page 40

1   Q.  Understood. But do you have a copy of
2   that?
3   A.  There should be a copy with the bank
4   statement, I can't verify that.
5   Q.  I would ask your attorney to have you
6   provide us with a copy of that particular bank
7   statement, please.
8   A.  The entire statement?
9   Q.  Yes, ma'am.
10  A.  Okay.
11  Q.  How long do you think it would take you to
12  be able to find that copy and, through your
13  attorney, provide us with that?
14  A.  A week, four days, five days.
15  Q.  Fairly quickly then?
16  A.  Yes.
17  Q.  Okay. Can we agree on trying to get it
18  done within five days?
19  A.  Yes.
20  Q.  Now, out of this $147,000 that was loaned
21  and it became an estate asset, did you use the
22  remainder of the money for estate purposes?
23  A.  I used 12,500 to purchase my grandmother's
24  farm back from the bankruptcy trustee.
25  Q.  Do you still -- does the estate still have

Sprague v Williams, et al.
Adv No. 15-010471

Page 11 (Pages 41-44)
Tammy Sprague
April 10, 2017

Page 41

1 that property in Roosevelt County?
2  A.  It was deeded over to me and my brother
3 and my sister. We were able -- we obtained it
4 through the bankruptcy trustee.
5  Q.  So title to that undivided one-half
6 interest is in the three children?
7  A.  Correct.
8  Q.  And that's where the title is as of today;
9 is that correct?
10  A.  Yes, that's correct.
11  Q.  Do you have it under contract for sale or
12 anything, or are you just --
13  A.  No, I do not.
14  Q.  -- are you all just holding it right now?
15  A.  It's family property on my mother's side,
16 no intent to sell.
17  Q.  Okay.
18      MR. MARTIN: Give me just a moment,
19 please.
20  Q.  (By Mr. Martin) You obtained the $147,000
21 check on approximately August 22nd, 2014, that's the
22 date of the check?
23  A.  Correct.
24  Q.  And you did not attempt to exercise the
25 redemption until April of 2015. What was your

Page 42

1 reason for waiting so long to attempt to exercise
2 the redemption?
3  A.  It just took me that long to get
4 everything in order and to hire appropriate counsel.
5  Q.  Now, when you say to "get everything in
6 order," explain that, please. What do you mean "get
7 everything in order"?
8  A.  It just took me that long to take action,
9 that's all I can say.
10  Q.  Why didn't you attempt to start the
11 redemption shortly after you obtained the $147,000?
12  A.  Because I wasn't clear on what the ruling
13 was on the position, I just needed legal counsel.
14  Q.  I'm not asking what counsel said, so
15 please understand that. At that time, you had
16 Mr. Arvizu, who had been representing your dad --
17  A.  Correct.
18  Q.  -- and now you, correct, as far as the --
19  A.  Correct.
20  Q.  I'm not asking what he's told you, so
21 again understand that, but did you attempt to obtain
22 advice from him about the redemption?
23  A.  Yes.
24  Q.  Did you seek a second opinion on the
25 redemption?

Page 43

1  A.  Yes.
2  Q.  Was it this Mr. --
3  A.  Moberly.
4  Q.  Is that how you pronounce it, Moberly?
5  A.  Correct, um-hmm.
6  Q.  I'm not asking, again, what either one
7 said, okay?
8  A.  Um-hmm.
9  Q.  Please understand that. Was there a
10 difference of opinion between Mr. Arvizu and
11 Mr. Moberly about the redemption and the exercising
12 of the redemption?
13  A.  None that I'm aware of.
14  Q.  Okay. Let me jump, if I may, to another
15 topic. There was some discussion prior to the start
16 of this deposition about the issue of damages based
17 upon the partial summary judgment entered by the
18 bankruptcy court. Can you tell me what damages you
19 are claiming at this point?
20  A.  I would be claiming my attorneys' fees,
21 both Mr. Moberly and Mr. Arvizu.
22  Q.  Do you know what those amounts are?
23  A.  Mr. Arvizu is 16,000 plus.
24  Q.  In relation to the -- is that the entire
25 charge for his representation in the bankruptcy?

Page 44

1  A.  That is his representation from the time
2 that we began the redemption.
3  Q.  And what are Mr. Moberly's charges?
4  A.  I can get you the exact amount.
5  Q.  Okay.
6  A.  $9,167.20.
7  Q.  And what documents are you looking at?
8  A.  Just my own personal notes.
9  Q.  And again, on Mr. Moberly, are you
10 claiming that that is in relation to the redemption?
11  A.  Yes, sir.
12  Q.  Okay. And not his entire representation
13 of you?
14  A.  He didn't represent me until we started
15 the redemption process.
16  Q.  Didn't he represent the -- if I've got my
17 timing correct, didn't he represent the estate when
18 there was the issue of trespass?
19  A.  No, sir, he did not.
20  Q.  And the deed that you did?
21  A.  No, he did not. I represented --
22  Q.  Why was he in court then?
23  A.  Because he represented Mr. Pete Joyce. I
24 represented myself pro se.
25  Q.  Are any of his charges in relation to